## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

American Bank of St. Paul,

             Plaintiff,

     v.

Carolina First Bank d/b/a Mercantile Bank,

             Defendant.

Civil No. 09-2240 (JMR/JJK)

**FIRST AMENDED COMPLAINT**

**Jury Trial Demanded**

Plaintiff American Bank of St. Paul ("American Bank"), for its complaint against Defendant Carolina First Bank d/b/a Mercantile Bank, alleges as follows:

## PARTIES

1.     American Bank is a Minnesota state banking corporation headquartered in St. Paul, Minnesota.  (American Bank also is known as the "Servicing Bank.")

2.     Carolina First Bank is a South Carolina corporation with its principal place of business in Greenville, South Carolina.  Mercantile Bank is a registered fictitious name held by Carolina First Bank in Florida (Carolina First Bank d/b/a Mercantile Bank referred to hereafter as "Mercantile Bank").

3.     Carolina First Bank does business as Mercantile Bank in 70 different locations in the State of Florida, with its principal place of business in Jacksonville, Florida.

4.     Prior to 2004, Mercantile Bank operated under the name Citrus Bank.

## JURISDICTION AND VENUE

5.     This Court has subject matter jurisdiction over the subject matter of this action under 28. U.S.C. § 1332 because there is complete diversity of citizenship between Plaintiff and Defendant and the amount in controversy exceeds $75,000.

6.     Venue is proper under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in Minnesota.

7.     American Bank brings this lawsuit in its capacity as the Servicing Bank seeking damages related to Multiple-Advance Term Loan, in which at least 25 other banks participated (the "Participant Banks"), as explained in further detail below.

8.     As Servicing Bank, American Bank is the real party in interest and will distribute sums recovered in this litigation to the Participant Banks pursuant to the terms of their respective participation in the Multiple-Advance Term Loan that forms the subject of this action.

## FACTUAL BACKGROUND

**A.     Mercantile Bank's relationship with Louis Pearlman.**

9.     Mercantile Bank had a commercial and personal depository and lending relationship with Louis J. Pearlman ("Pearlman") and Trans Continental Airlines, Inc. ("TCA"), dating back to at least 2001.

10.     At the time, Pearlman was a Florida resident.  Pearlman currently is an inmate in the Federal Bureau of Prisons system.

11.     TCA is a Florida corporation in which Pearlman held a majority ownership interest.  TCA currently is in bankruptcy in the United States Bankruptcy Court for the Middle District of Florida in Orlando, Florida.

12.     Pearlman maintained depository accounts at Mercantile Bank until late 2005/early 2006.  At their peak, Pearlman's depository accounts at Mercantile Bank contained more than $4,000,000.

13.     Pearlman also had a lending relationship with Mercantile Bank.

14.     Mercantile Bank's lending relationship with Pearlman included the following transactions:

  a.     On or about July 26, 2001, Pearlman secured a $6,000,000 loan from Citrus Bank.

  b.     On or about April 2, 2002, Pearlman executed a second mortgage on a personal residence in favor of Citrus Bank.

  c.     On or about April 2, 2002, Pearlman entered into an amended loan agreement with Citrus Bank modifying the terms of the $6,000,000 loan secured on or about July 26, 2001.

d.     On or about April 2, 2002, Pearlman secured a $2,000,000 line of credit from Citrus Bank, which was evidenced by a promissory note executed on or about the same date.

e.     On or about June 24, 2002, TCA entered a draw loan agreement with Citrus Bank for $500,000.

f.     In September 2004, TCA executed a renewal promissory note for $498,000 in favor of Mercantile Bank.

g.     On or about May 19, 2003, Pearlman entered into a note modification agreement with Mercantile Bank modifying the terms of a promissory note executed on April 2, 2002.

h.     On or about May 23, 2003, Pearlman secured a $6,000,000 loan from Mercantile Bank, which was evidenced by a promissory note executed the same date.

i.     On or about February 27, 2004, Pearlman secured a $6,000,000 loan from Mercantile Bank, which was evidenced by a promissory note executed on the same date (the "February 2004 Loan").

j.     On or about January 11, 2005, Pearlman obtained a $2,000,000 loan from Mercantile Bank, which was evidenced by a promissory note executed the same date.

15.     Pearlman's obligations to Mercantile Bank were secured by, among other collateral, a pledge of Pearlman's interest in 190,000 preferred shares of TCA stock and 347,925 common shares of TCA stock.

4

16.     Mercantile Bank originated and/or extended each of the loans to Pearlman and/or TCA consistent with its policies and procedures, regulatory requirements, and industry standards.

17.     Mercantile Bank reviewed each loan and/or extension prior to making it consistent with its policies and procedures, regulatory requirements, and industry standards.

18.     In connection with each loan and/or extension, Mercantile Bank performed industry-standard due diligence on Pearlman and/or TCA.

19.     Based on its due diligence, Mercantile Bank determined that the loans conformed to its policies and procedures, regulatory requirements, and industry standards.

20.     Based on its due diligence, Mercantile Bank reasonably believed that each of its loans to Pearlman and TCA were fully secured.

21.     Based on its due diligence, Mercantile Bank originated and/or extended each loan identified in paragraph 14 above.

22.     Prior to January 2005, Mercantile Bank did not possess any information that raised concerns that Pearlman and TCA were engaged in any fraud with respect to Pearlman's various business entities or loans with Mercantile Bank.

23.     On or about March 8, 2005, Mercantile Bank employee Rick Anderson submitted a loan modification request seeking to extend the terms of Pearlman's February 2004 Loan.

24.     Thereafter, on March 28, 2005, Mercantile Bank extended the maturity date of Pearlman's February 2004 Loan to May 5, 2005.

5

25.     At the time Mercantile Bank extended the date of Pearlman's February 2004 Loan, Pearlman was current on all of his debt obligations to Mercantile Bank, including the loans to TCA.

26.     By May 2005, Pearlman owed Mercantile Bank more than $13 million in connection with the various loans and lines of credit issued to Pearlman and/or TCA.

**B.     Mercantile Bank seeks to restructure Pearlman's loan obligations.**

27.     In Spring 2005, Mercantile Bank again considered extending the terms of Pearlman's February 2004 Loan.

28.     Specifically, Mercantile Bank considered extending the terms of Pearlman's February 2004 Loan for 90 days so that Mercantile Bank could: (a) restructure all of Pearlman's outstanding debt to Mercantile Bank; and (b) provide additional credit or loans to Pearlman of up to $3 million in the form of bridge financing to Pearlman for future business and/or real estate investments.

29.     In connection with the extension, Mercantile Bank sought to obtain the following from Pearlman:

a.      The sources of Pearlman's existing and future cash flow, including expected royalty streams;

b.      Information concerning an offshore trust, which purportedly was the recipient of distributions from TCA;

c.      Information concerning management succession for TCA;

d.      Information concerning the beneficiaries of a certain life insurance policy on Pearlman;

6

e.     Information concerning whether TCA had pledged any of its shares to any of its other lenders; and

f.     Information concerning TCA's current leases.

30.     The information sought by Mercantile Bank was more extensive than previously was sought in connection with the due diligence, review, and/or analysis it performed in connection with Pearlman's and TCA's previous loans and/or extensions.

31.     On or about June 17, 2005, Mercantile Bank provided Pearlman with a list of questions seeking the information listed in paragraph 29.

32.     On information and belief, and although the loan was current, as of June 17, 2005, Pearlman had not made any reductions in the principal amount of the February 2004 Loan.

33.     In evaluating whether to extend the terms of the February 2004 Loan, Mercantile was concerned that Pearlman had not made any reductions in the principal amount and was further concerned that Pearlman was using the Loan for permanent rather than temporary capital needs.

34.     Based on information acquired during its lengthy relationship with Pearlman and TCA and because of the size of Pearlman's obligations to Mercantile Bank, Mercantile Bank began to have concerns regarding Pearlman's ability to repay those obligations.

**C.     Mercantile Bank meets with Pearlman concerning its request for additional financial information.**

35.     In the summer of 2005, Mercantile Bank participated in two meetings with Pearlman.

7

36.     On information and belief, those meetings were conducted telephonically.

37.     The purpose of these meetings was to give Mercantile Bank a better understanding of the financial status of Pearlman and TCA, as well as to obtain information responsive to the topics listed in paragraph 29.

38.     By the time of the first telephone conference, Mercantile Bank had information that TCA may have pledged its stock, listed as security on Mercantile Bank's loans, to Integra Bank as collateral for debt obligations issued by that financial institution.

39.     As a result, during the telephone conferences, Mercantile Bank sought information from Pearlman and TCA about TCA stock.

40.     Prior to the telephone conferences, Mercantile Bank also determined that it lacked sufficient information concerning Cohen & Siegel, the accounting firm that prepared and signed TCA's audited financial statements as certified public accountants.

41.     When the Pearlman and TCA loans were originated and/or extended, Mercantile Bank relied on the audited financial statements prepared by Cohen & Siegel.

42.     Mercantile Bank's reliance on audited financials is consistent with its policies and procedures, regulatory requirements, and industry standards.

43.     During the telephone conferences, Mercantile Bank sought additional information from Pearlman concerning Cohen & Siegel.

44.     During the telephone conferences, Pearlman informed Mercantile Bank that he had access to an offshore trust in the Bahamas worth hundreds of millions of dollars.

45.     Pearlman assured Mercantile Bank that, because of this offshore trust, it should not be concerned about his personal financial status or the financial status of TCA as they related to his debt with Mercantile Bank.

46.     Despite Pearlman's assurances, Mercantile Bank continued to seek additional financial information, including information related to stock and leases of TCA.

47.     During the second telephone conference, Mercantile Bank also requested a meeting with TCA executives and management.

48.     Pearlman agreed to schedule a meeting with TCA executives.

49.     Pearlman also provided to Mercantile Bank a list of TCA executives and additional information related to Cohen & Siegel.

50.     On information and belief, Mercantile Bank never met with executives from TCA.

51.     On information and belief, Pearlman never provided Mercantile Bank with information concerning the offshore trust.

52.     On information and belief, Pearlman never provided Mercantile Bank with the majority of the information listed in paragraphs 29, 39, 43, 46 and 47.

53.     Additionally, during this time period, Mercantile Bank had difficulty contacting Pearlman to inquire into the status of the information it sought.

54.     Pearlman attempted to explain away these difficulties by citing his extensive travel to Europe in connection with the management and operation of his various businesses.

9

**D.** **Mercantile Bank hires international due diligence, investigation and risk consulting firm to investigate TCA and Cohen & Siegel.**

55. During the summer of 2005, and based on its inability to obtain additional information from Pearlman and its concerns regarding the veracity of the information actually provided during the course of its relationship with Pearlman and TCA, Mercantile Bank hired NFC Global, LLC ("NFC Global"), to conduct an investigation into TCA, Cohen & Siegel, and S. Kaplan & Co.

56. Like Cohen & Siegel, S. Kaplan & Co. provided certified financial statements concerning Pearlman and/or his various related entities to Mercantile Bank in connection with certain loans originated and/or funded by Mercantile Bank.

57. NFC Global is a worldwide provider of due diligence, investigation, and risk consulting services which serves numerous financial services companies, including Carolina First Bank.

58. Prior to 2005, Mercantile Bank did not retain NFC Global to investigate or perform due diligence concerning Pearlman, TCA, or his related entities.

59. Mercantile Bank's internal policies and procedures, regulatory requirements, and industry standards do not require the retention of firms such as NFC Global to conduct investigations prior to making loans to individuals and corporations.

60. The retention of NFC Global to investigate Pearlman and TCA was outside of Mercantile Bank's customary lending practices and procedures.

61. On August 22, 2005, NFC Global sent an email to Mercantile Bank informing it that Cohen & Siegel was not registered with the Florida State Board of

Accountancy, was not registered as a corporate entity with the Florida Secretary of State, and did not have parent or affiliate entities located in Germany.

62.     Thereafter, on August 30, 2005, NFC Global provided Mercantile Bank with a summary of its investigation.

63.     With respect to Cohen & Siegel and Stanley Kaplan, NFC Global reported that:

a.     The names Cohen & Siegel, Stanley Kaplan, Alan Siegel and Arthur Siegel were not registered with the Florida Secretary of State, Division of Corporations;

b.     Cohen & Siegel, Stanley Kaplan, Alan Siegel and Arthur Siegel were not licensed by the State of Florida, Board of Accountancy;

c.     Cohen & Siegel, Stanley Kaplan, Alan Siegel and Arthur Siegel were not licensed with the State of New York, Board of Accountancy;

d.     The American Institute of Certified Public Accountants was not familiar with Cohen & Siegel, Stanley Kaplan, or Arthur Siegel;

e.     CPADirectory.com, a company which performs CPA verifications pertaining to firms and individuals, confirmed that Cohen & Siegel was not a registered or licensed CPA firm in the State of Florida;

f.     The phone number associated with Cohen & Siegel's Coral Gables, Florida, address was an answering service and Cohen & Siegel did not operate from that Florida address.

64.     NFC Global further reported that it received a phone call from an individual identifying himself as Mr. Siegel who stated that Cohen & Siegel is not registered or licensed in the United States and that he was calling from Germany.

65.     However, NFC Global confirmed that Cohen & Siegel, Stanley Kaplan, and Arthur Siegel were not registered with the German Chambers of Commerce, German Trade Registers, German Chamber of Certified Public Accountants, German Tax Authority, or the German Chamber of German Tax Consultants.

66.     With respect to TCA, NFC Global reported:

a.     TCA was a legally registered Florida corporation with four different corporate registrations, including four different corporate addresses and four different corporate registration numbers;

b.     No aircraft were directly registered to TCA.

67.     The information provided by NFC Global was contrary to the information provided by Pearlman to Mercantile Bank in connection with each of his loans and the loans to TCA.

68.     Based on the information from NFC Global's investigation, Mercantile Bank expanded its investigation into Pearlman and his related entities.

**E.     Mercantile Bank declares Pearlman's February 2004 Loan in default and enters forbearance agreement.**

69.     On August 29, 2005, Mercantile Bank notified Pearlman that the February 2004 Loan had matured and was in default.

70.     Mercantile Bank demanded that Pearlman arrange payment to satisfy the February 2004 Loan.

71.     Between August 29th and September 21st, Mercantile Bank took no other action with respect to any of Pearlman's loans and it did not declare any of Pearlman's other loans in default.

72.     Based on the NFC Global report, by no later than August 30, 2005, Mercantile Bank was aware that Pearlman was in violation of numerous representations and warranties underlying all of his loans and credits with Mercantile Bank.

73.     Based on the NFC Global report, Mercantile Bank could have declared all of Pearlman's loans and credits in default and commenced collection proceedings against him to collect on those obligations.

74.     Based on the NFC Global report, Mercantile Bank would have been justified in refusing to extend further credit to Pearlman.

75.     In fact, based on the information in the NFC Global report, extending additional credit to Pearlman or TCA would have violated Mercantile Bank's policies and procedures, regulatory requirements, and industry standards.

76.     Mercantile Bank does not extend credit to individuals or entities where the authenticity of audited financials is in doubt or where Mercantile Bank has discovered that the accounting firm(s) which prepared the audited financials does not exist.

77.     Mercantile Bank did not accelerate any of Pearlman's or TCA's loans during this time period.

78.     Mercantile Bank made the decision not to accelerate the loans or proceed with legal action to give Pearlman the time to refinance his loans with another bank and satisfy his obligations to Mercantile Bank.

79.     On or about September 22, 2005, Mercantile Bank met with Pearlman to discuss the default of the February 2004 Loan.

80.    In this meeting, Mercantile again requested the financial information related to Pearlman and TCA that it previously requested in connection with the loan extension.

81.    During this meeting, Pearlman represented to Mercantile Bank that he would provide the requested information.

82.    On information and belief, during this meeting, Pearlman represented that he was working to refinance his obligations to Mercantile Bank with another lender.

83.    On September 26, 2005, Mercantile Bank sent a letter to Pearlman stating that Mercantile Bank would enter into a forbearance agreement with Pearlman until December 15, 2006, so that Pearlman could provide additional financial information to Mercantile Bank and to provide Pearlman the time to refinance his obligations.

84.    In that September 26 letter, Mercantile Bank specifically requested:

a.    To meet with TCA's CPA firm to fully understand TCA's financial reports and records.

b.    To meet with TCA's management to fully understand TCA's operations.

c.    To meet with Trans Continental Companies' management to understand Pearlman's other companies and their relationship to his global cash flow.

d.    Pearlman's 2004 income tax return.

e.    Bank reference and contact information related to TCA for Kommerz Bank, Citicorp Bank, and Scotia Bank.

f.      Detailed information related to TCA's stock, including preferred and common stock, Pearlman's ownership stake, and any assignment interests made in Pearlman's ownership stake.

g.      A current statement of Pearlman's global cash flow.

h.      Lists of all TCA's subsidiary companies, partnerships or limited partnerships.

i.      Copies of leases of all aircraft owned or managed by TCA.

j.      Tail numbers of aircraft owned by TCA or its subsidiaries.

85.      On September 26, 2005, Mercantile Bank, Pearlman, Trans Continental Records, Inc., and TCA entered into a forbearance agreement (the "Forbearance Agreement") modifying the terms of the February 2004 Loan.

86.      Under the Forbearance Agreement, Mercantile agreed to forbear its default remedies until at least December 15, 2005.

87.      In connection with the Forbearance Agreement, Pearlman made a payment to Mercantile Bank under his February 2004 Loan.

88.      In the Forbearance Agreement, and among other representations, Pearlman represented that all financial statements and information previously and thereafter provided to Mercantile Bank were true, correct and complete, did not contain any untrue statements of material fact, and did not omit any material fact necessary to make the information not misleading.

89.      The Forbearance Agreement further provided that any breach of a representation or warranty constituted a breach of the Agreement which entitled Mercantile Bank to accelerate the loan.

90.    At the time the Forbearance Agreement was executed, Mercantile Bank knew that Pearlman's representations in the Forbearance Agreement concerning the financial statements previously provided to Mercantile Bank were false.

91.    Because Mercantile Bank knew that Pearlman's representations in the Forbearance Agreement were false, and based on the information from NFC Global, entering the Forbearance Agreement violated Mercantile Bank's lending policies and applicable federal and state banking regulations.

92.    Had Mercantile Bank elected to accelerate all of Pearlman's and TCA's loans and foreclose on Pearlman's and TCA's obligations, Pearlman's default would have become public knowledge and Pearlman would not have been able to refinance and satisfy his obligations to Mercantile Bank.

93.    Mercantile Bank entered into the Forbearance Agreement and chose not to accelerate other credit extended to Pearlman and his companies because Mercantile Bank wanted to assist Pearlman in obtaining financing from other lenders that would allow Pearlman to pay off outstanding debt to Mercantile Bank.

**F.    Mercantile Bank had comprehensive knowledge that Pearlman had fraudulently represented his financial status and assets, as well as the financial status and assets of TCA.**

94.    By late 2005, Mercantile Bank had extensive knowledge related to Pearlman's false representations concerning his personal finances, TCA's finances and assets, and his ability to pay his outstanding debt.

95.    With respect to Cohen & Siegel, Mercantile Bank:

a.    Knew Cohen & Siegel was not registered or licensed, and did not have offices in, Florida, New York or Germany.

16

b.     Knew Cohen & Siegel, and its purported principals, were not licensed CPAs in Florida, New York, or Germany.

c.     Knew that no record could be found concerning Stanley Kaplan, the purported principal of Cohen & Siegel who prepared Pearlman's and Trans Continental Airlines' tax returns.

d.     Knew that Cohen & Siegel had given inconsistent and conflicting explanations as to why the firm had no employees in the United States.

96.     With respect to TCA's audited financial statements and assets, Mercantile Bank:

a.     Knew that the opinion letter supporting TCA's audited financial statements was signed by Cohen & Siegel, which it knew to be a fictitious accounting firm.

b.     Knew that it was unable to verify that TCA possessed the cash and equivalents it represented it had, that TCA owned fourteen aircraft, or that TCA was a licensed air carrier.  Mercantile Bank's investigation showed that TCA owned only three aircraft in or around late 2005.

c.     Knew that TCA's stock was overpledged, having pledged up to 10 million shares of preferred stock when only 400,000 shares had been issued at that time.

d.     Knew that it did not possess a comprehensive breakdown of contingent liabilities and financial statements for affiliates guaranteed by TCA, and recognized that it needed such information to have a complete picture of Pearlman's and TCA' financial status.

17

e.      Knew that it did not have financial information concerning an offshore trust in which Pearlman claimed to have access.

f.      Knew that it did not possess a tax return for TCA since 2002.

97.    With respect to a $50 million life insurance policy allegedly held in Pearlman's name, Mercantile Bank also was unable to verify whether that policy was payable to TCA and whether that policy had been pledged as collateral to other lenders.

98.    On information and belief, Mercantile Bank was unable to determine whether the insurance policy even existed.

99.    With respect to a Pearlman's personal financial status, Mercantile Bank:

a.      Did not possess Pearlman's current Personal Financial Statement.

b.      Could not find UCC records related to First National Bank & Trust debt that Pearlman represented to Mercantile Bank he possessed.

c.      Knew that Pearlman's most recent Personal Financial Statement for Pearlman in Mercantile Bank's possession did not reflect a $27 million mortgage obligation on the Church Street Station property owned by Pearlman.

d.      Knew that the most recent tax return on file for Pearlman was from 2003.

100.   With respect to documents Mercantile Bank possessed in late 2005, Mercantile Bank:

a.      Knew that an agreement subordinating the interests of a Pearlman trust in TCA shares covered only 204,600 shares, fewer than those pledged to Mercantile Bank.

b.      Knew that, as of May 2003, Pearlman had pledged as collateral more than 617,000 shares of TCA stock.  Mercantile Bank also knew that the more than 617,000 shares of TCA stock pledged represented approximately sixty-six percent of outstanding TCA stock and that Pearlman only owned fifty-one percent of TCA stock.

c.      Knew that in addition to the more than 617,000 shares of TCA stock referenced in subsection (b) of this paragraph, Pearlman had pledged an additional 200,000 shares to First International Bank & Trust in or about February 2005.

101.   In late 2005, based on the knowledge Mercantile Bank possessed, it devised a strategy regarding Pearlman's debt, assets, and financial status, which included:

a.      Monitoring Pearlman's depository accounts daily.

b.      Consulting with a litigation attorney concerning potential remedies available against Pearlman.

c.      Requesting to review audit paperwork from TCA's most recent year-end financial statement.

d.      Requesting proof of payment from TCA and requesting Pearlman's most recent tax returns.

e.      Requesting from Pearlman a $500,000 paydown on the February 2004 Loan and obtaining a lien on Pearlman's home and Church Street Station property.

102.   Mercantile Bank devised this strategy as a temporary measure while it waited for Pearlman to secure financing from other lenders that would allow Pearlman to pay off existing debt to Mercantile Bank.

103.   In late 2005 or early 2006, Pearlman closed all depository accounts he maintained at Mercantile Bank.

19

G.     **The American Bank credit and Mercantile Bank's participation in that credit.**

1.     **The Offering Memorandum**

104.   In late 2005, Pearlman began working with North American Capital Markets ("NACM"), a financial private placement agent, to secure financing to pay off Pearlman's debts to Mercantile Bank and for other business investment opportunities.

105.   At the time, Pearlman was seeking a loan totaling $28.5 million.

106.   NACM attempted to solicit offers for the $28,500,000 secured term loan ("Secured Term Loan") on behalf of Pearlman, Trans Continental Records, Inc., and Top of the Pops, LLC.

107.   Mercantile Bank understood that if Pearlman secured new financing, the money would be used to satisfy all existing obligations owing to Mercantile Bank.

108.   However, Pearlman informed Mercantile Bank that it would need to participate in the loan in an amount in excess of $2,000,000 to allow the participation loan to be completed.

109.   In a participation loan, it typically is the case that the loan will not be completed if the aggregate amount sought under the loan is not obtained.  In this case, if Pearlman did not obtain sufficient commitments from financial institutions, the loan would not have been made.

110.   Mercantile Bank represented to Pearlman that it would participate in any loan provided that all outstanding debt would be immediately satisfied from the loan proceeds.

111.   In February 2006, and as part of its efforts to secure loan participants, NACM circulated a Confidential Loan Offering Memorandum ("Offering Memorandum") to various financial institutions.

112.   American Bank and the Participant Banks, including Mercantile Bank, received the Offering Memorandum.

113.   American Bank and many of the Participant Banks had no prior relationship with Pearlman or his related entities.

114.   The Offering Memorandum outlined the terms and uses of the proposed $28,500,000 secured term loan.

115.   The Offering Memorandum listed as security for the $28,500,000 proposed loan 347,925 common shares of TCA stock and 190,000 preferred shares of TCA stock.

116.   The 347,925 common shares and 190,000 preferred shares of TCA stock offered as collateral for the proposed $28,500,000 loan were the same shares of stock that secured Pearlman's obligations to Mercantile Bank.

117.   The Offering Memorandum listed the book value of the preferred and common shares of TCA stock.

118.   The Offering Memorandum included a Personal Financial Statement of Pearlman as of June 1, 2005, and tax returns for Pearlman for 2002, 2003, and 2004, which were prepared and signed by Stanley Kaplan of S. Kaplan & Co., CPAs.

119.   The Offering Memorandum included TCA balance sheets, statement of operations and statements of cash flow, and multiple audited financial statements for TCA, signed by "Cohen & Siegel, Certified Public Accountants," as well as information concerning TCA's leases.

21

120.   The Offering Memorandum included Trans Continental Records balance sheets and profit and loss statements.

121.   The Offering Memorandum included background and forecasted financial information concerning the Top of the Pops television program.

122.   The Offering Memorandum contained a two-and-a-half page narrative concerning TCA.   In the narrative, the Offering Memorandum represented that TCA currently managed 58 aircraft, 39 of which were owned by limited partnerships in which TCA served as the general partner.   The Offering Memorandum further stated that eight of the aircraft were owned by TCA.

123.   The Offering Memorandum listed the payoff of Mercantile Bank and closing costs totaling $13.1 million as one of the uses for the funds.

124.   At the time Mercantile Bank received the Offering Memorandum, it knew that the information concerning TCA stock, TCA's aircraft, Pearlman's personal financial statements, Pearlman's tax returns, TCA balance sheets, and TCA audited financial statements were false.

125.   At the time Mercantile Bank received the Offering Memorandum, it knew that the collateral for the proposed loan was over pledged.

126.   At the time Mercantile Bank received the Offering Memorandum, it knew that the accounting firms that provided the "audited" financials for Pearlman's entities did not exist.

127.   In light of the information possessed by Mercantile Bank regarding Pearlman, TCA, their accountants, the collateral, and the financials, Mercantile Bank could not participate in the loan in the ordinary course of business.

22

**2.**     **Consistent with its representations to Pearlman, Mercantile Bank agrees to participate in the Secured Term Loan on a temporary basis.**

128.    In connection with its temporary participation in the Secured Term Loan, Mercantile Bank prepared a Loan Presentation Report.

129.    Mercantile Bank's Loan Presentation Report outlined the terms of the Secured Term Loan and stated as reasons for Mercantile Bank's participation that it wanted to terminate its $6 million line of credit for the February 2004 Loan and reduce its overall credit exposure to Pearlman and TCA.

130.    The Loan Presentation Report stated that the Secured Term Loan would be used to repay existing debt extended to Pearlman and TCA by Mercantile Bank.

131.    The Loan Presentation Report further stated that, under the terms of the Secured Term Loan, Mercantile Bank would have all of its debt to Pearlman and related entities paid off before the other Participant Banks and Servicing Bank.

132.    The Loan Presentation Report listed as collateral for the Secured Term Loan 347,925 common shares and 190,000 preferred shares of TCA stock.

133.    The Loan Presentation Report omitted all of the information Mercantile Bank learned in connection with the investigation of NFC Global.

134.    In early 2006, Mercantile Bank agreed to participate in the Secured Term Loan on a temporary basis.

135.    Mercantile Bank agreed to participate in the Secured Term Loan solely so that Pearlman could obtain that Loan and pay off the existing debt to Mercantile Bank.

136.    Mercantile Bank participated in the Secured Term Loan even though it knew that the information contained in its Loan Presentation Report concerning

Pearlman's personal financial status, TCA stock, and TCA's financial status and business operations, was false.

137.   Mercantile Bank participated in the Secured Term Loan even though it knew that Pearlman could not satisfy his existing debt obligations to Mercantile Bank, which amounted to less than half of the amount of the proposed Secured Term Loan.

138.   Mercantile Bank participated in the Secured Term Loan even though the loan was uncollateralized because the TCA stock offered as collateral for the loan was over pledged.

### 3.   Pearlman and American Bank enter into Multiple-Advance Term Loan Agreement.

139.   On or about March 27, 2006, Pearlman, Trans Continental Records, and TOTP, LLC (collectively, the "Borrowers"), entered into a Multiple-Advance Term Loan Agreement with American Bank.

140.   The Multiple Advance-Term Loan agreement resulted in a Multiple-Advance Term Loan, which is synonymous with the term "Secured Term Loan" as used in the Offering Memorandum.

141.   Under the terms of the Multiple-Advance Term Loan Agreement, American Bank agreed to lend the borrowers $28,500,000.

142.   On or about March 27, 2006, in connection with the Multiple-Advance Term Loan Agreement, the Borrowers executed a promissory note for $28,500,000 in favor of American Bank.

143.   American Bank financed $5.0 million of the Multiple-Advance Term Loan.

144. On or about March 27, 2006, in connection with the Multiple-Advance Term Loan Agreement, Pearlman executed a Securities Pledge Agreement in favor of American Bank pledging a security interest in 347,925 common shares and 190,000 preferred shares of TCA stock as collateral.

145. In the Securities Pledge Agreement, Pearlman represented to American Bank that the pledged TCA shares were valid, that Pearlman was the sole owner and the shares were free and clear of any liens or other security interests, and that the Securities Pledge Agreement created the only security interest in those shares.

146. Pursuant to an agreement, Mercantile Bank, which previously had a security interest in those 347,925 common shares and 190,000 preferred shares of TCA stock, agreed to release those shares of stock to allow Pearlman to execute the Securities Pledge Agreement in favor of American Bank.

147. However, Mercantile Bank did not release all of the TCA shares until all of its outstanding obligations were satisfied through payments from American Bank under the Multiple Advance Term Loan.

148. Mercantile Bank released those TCA shares solely so that Pearlman could secure financing in order to pay off existing debt to Mercantile Bank.

149. Based upon information provided by to the Participant Banks, and based on the release of TCA stock as collateral for existing debt, Mercantile Bank knew that the 347,925 common shares and 190,000 preferred shares of TCA stock were being pledged as collateral for the Multiple-Advance Term Loan.

150.   Mercantile Bank further knew that Pearlman fraudulently pledged the 347,925 common shares and 190,000 preferred shares of TCA stock as collateral for the Multiple-Advance Term Loan and that the stock was over pledged.

151.   Mercantile Bank never informed American Bank or any Participant that the collateral was over pledged.

152.   Mercantile Bank never informed American Bank or any Participant of the information it learned in connection with its relationship with Pearlman and the NFC Global investigation.

153.   Because it previously performed industry standard due diligence when it agreed to make other loans to Pearlman, Mercantile Bank knew that industry standard due diligence performed by American Bank before entering the Multiple-Advance Term Loan Agreement would not uncover the information it learned from NFC Global or, more generally, Pearlman's fraud.

### 4.   Mercantile Bank enters into Loan Participation and Servicing Agreement with American Bank.

154.   On or about March 27, 2006, simultaneously with the Borrowers' execution of the Multiple-Advance Term Loan Agreement, Mercantile Bank entered into a Loan Participation and Servicing Agreement (the "Participation Agreement") with American Bank with respect to the initial advance on the $28,500,000 promissory note Pearlman executed in connection with the Multiple-Advance Term Loan.

155.   Mercantile Bank, as a Participant Bank, agreed to purchase a portion of the $28,500,000 loan American Bank advanced to the Borrowers under the terms of the Multiple-Advance Term Loan Agreement and related documents.

156.    The portion of the $28,500,000 Multiple-Advance Term Loan Mercantile Bank agreed to purchase was $1,893,386.72.

157.    Mercantile Bank did not contribute additional funds in connection with the participation.  Instead, it participated in the loan to the extent of amounts remaining on its prior obligations that were not going to be paid in connection with the initial advance.

158.    Mercantile Bank agreed to purchase $1,893,386.72 of the Multiple-Advance Term Loan amount because that was the amount needed to reach the $28,500,000 figure which the borrowers requested.

159.    Without Mercantile Bank's participation, the Multiple-Advance Term Loan would not have been closed.

160.    Mercantile Bank participated in the Multiple-Advance Term Loan to conceal Pearlman's and TCA's fraudulent activities and to make the Multiple-Advance Term Loan transaction appear legitimate.

161.    Mercantile Bank participated in the Multiple-Advance Term Loan so that Pearlman could secure financing in order to pay off existing obligations to Mercantile Bank.

162.    Mercantile Bank knew that the American Bank's and the Participant Banks' industry standard due diligence performed before entering the Participation Agreement would not uncover Pearlman's fraud.

163.    Under the Participation Agreement, Mercantile Bank's participation interest would be reduced to $0 before additional advances would be made to the Borrowers.

164.    As a term of the Participation Agreement with American Bank, Mercantile represented that it had received financial and other information from the Borrowers

27

sufficient and necessary to make an informed credit decision concerning whether to purchase an ownership interest in the Multiple-Advance Term Loan.

165.    As a term of the Participation Agreement with American Bank, Mercantile Bank represented that it chose to participate in the Multiple-Advance Term Loan based on its own credit investigation, credit analysis, and due diligence.

166.    In fact, Mercantile Bank knew at the time it entered the Participation Agreement with American Bank that Pearlman had falsified information related to his financial status and income flow.

167.    Mercantile Bank knew at the time it entered the Participation Agreement with American Bank that the TCA stock pledged as had been pledged to secure debt from other lenders and that more shares of TCA stock had been pledged as collateral for outstanding debt than existed outstanding shares.

168.    Mercantile Bank knew at the time it entered the Participation Agreement with American Bank and that Pearlman did not have the income or financial resources to cover his existing debt obligations, let alone the obligations under the Multiple-Advance Term Loan.

169.    Despite this knowledge, Mercantile Bank further represented in the Participation Agreement that the purchase of an interest in the Multiple-Advance Term Loan did not conflict with any order, rule or regulation applicable to it.

**H.    Based on the terms of the Multiple-Advance Term Loan, Mercantile Bank's credit obligations are satisfied and Pearlman and the other Borrowers Default on their obligations.**

170.    On or about March 28, 2006, the first advance under the Multiple-Advance Term Loan, totaling $21,038,386.72, was funded and distributed under the terms of that agreement.

171.    Mercantile Bank received approximately $11,038,386.72 of the initial advance to pay down the $13 million debt owed by Pearlman and TCA.

172.    On or about April 26, 2006, the second portion of the Multiple-Advance Term Loan, totaling $7,461,613.28, was funded and distributed under the terms of that agreement.

173.    The second advance was governed by an amendment to the Participation Agreement in which new or existing participants contributed additional amounts to purchase, at least in part, Mercantile Bank's participation interest.

174.    In connection with the amendment to the Participation Agreement, Mercantile Bank failed to inform the Servicing Bank or any of the participants of the information it learned concerning Pearlman and TCA.

175.    Following the funding of the second portion of the Multiple-Advance Term Loan, Mercantile Bank's debt was satisfied.

176.    On or about December 1, 2006, the Borrowers defaulted on all principal and interest payments under the terms of the Multiple-Advance Term Loan.

177.    The collateral securing the Secured Term Loan is not sufficient to satisfy the balances due.

178.   Based on amounts paid by Borrowers prior to their default, American Bank currently is owed principal in the amount of $27,237,549.62.

179.   American Bank and the participants currently are defending avoidance actions that seek return of all amounts paid by Pearlman and his entities under the Multiple-Advance Term Loan.

180.   With principal, interest, and late charges the Borrowers owe American Bank at least $36,337,193.

181.   American Bank anticipates that it will not recover any further amounts in connection with the bankruptcy proceedings of the Borrowers.

**I.   Pearlman's fraud against individuals and financial institutions is discovered by federal authorities and Pearlman pleads guilty to fraud in federal court.**

182.   In June 2007, after defaulting on all outstanding loans to various financial institutions, Pearlman was arrested in Singapore and charged with, among other things, bank fraud, mail fraud, and wire fraud.

183.   In May 2008, Pearlman pled guilty to charges of conspiracy, money laundering and making false statements.  Pearlman was sentenced to twenty-five years in federal prison.

184.   In connection with criminal and civil investigations, it was discovered that Pearlman had been operating an elaborate Ponzi scheme for more than twenty years that defrauded investors and financial institutions out of more than $500 million.

185.   Pearlman's Ponzi scheme involved fraudulent investment schemes and bank fraud.

186.   Pearlman fraudulently raised money for his Ponzi scheme by offering investors the opportunity to invest funds in an "Employee Investment Savings Account" program maintained by TCA (the "EISA Program").

187.   Investors in the EISA Program were told that their money would yield above-market rates of return because the money was invested through TCA which had banking relationships that allowed it to earn higher rates.

188.   Pearlman represented to EISA investors that their money was deposited into individual bank accounts that were FDIC-insured and that were re-insured by Lloyds of London or AIG Insurance.

189.   In fact, EISA investors' money was not deposited into individual bank accounts, and it was not insured by the FDIC, Lloyds of London, or AIG Insurance, or any other insurance company.

190.   Instead, EISA investors' money was deposited in checking accounts controlled by TCA and disbursed to other parties and used to repay prior investors in the EISA Program.

191.   Pearlman admitted in United States District Court, in connection with his criminal prosecution, that the EISA Program was a Ponzi scheme.

192.   From at least 2003 to 2007, Pearlman engaged in massive fraud against financial institutions in order to fund his Ponzi scheme.

193.   On information and belief, Pearlman, TCA, and Pearlman's other entities borrowed in excess of $150 million in secured and unsecured loans from numerous banks, including the Multiple-Advance Term Loan from American Bank.

194.   To perpetrate this bank fraud, Pearlman created, with the assistance of others, offering memoranda and due diligence materials that he submitted to banks, including to American Bank, to convince banks to make loans to him and his companies.

195.   These due diligence materials included, but were not limited to, financial statements for Pearlman and his companies, including TCA, and audited financial statements and related reports that were purportedly audited by Cohen & Siegel.

196.   The bank fraud Pearlman perpetrated on American Bank, including creating and submitting false offering memoranda and fictitious due diligence materials.

197.   The information of which Mercantile Bank knew before the Offering Memorandum was created, and before American Bank entered the Multiple-Advance Term Loan, including that Pearlman fabricated financial statements and audited financial statements, that Cohen & Siegel and the accounting firms did not exist, that TCA's stock either did not exist or was over-pledged, and that TCA did not own the assets it claimed, was consistent with and part the larger bank fraud scheme Pearlman perpetrated between at least 2003 and 2007.

198.   Indeed, all of the information Mercantile Bank obtained from NFC Global was consistent with the larger Ponzi scheme perpetrated by Pearlman on American Bank and other financial institutions.

199.   Mercantile Bank knew of and was complicit in the bank fraud Pearlman later admitted to in United States District Court.

200.   Mercantile Bank conspired with and assisted Pearlman in committing fraud so that Mercantile Bank could eliminate the credit extended to Pearlman while American

Bank assumed that credit risk and ultimately suffered a loss due to Pearlman's criminal acts.

201.    As a result of Mercantile Bank's actions, Mercantile Bank suffered no losses in connection with Pearlman's fraud.

202.    In contrast, American Bank lost nearly the entire amount of its loan to Pearlman.

203.    Had American Bank been informed of the information Mercantile Bank possessed at the time of the Offering Memorandum and Multiple-Advance Term Loan, it would not and could not have made the loan to the Borrowers and would have suffered no damages upon the discovery of Pearlman's Ponzi scheme.

### COUNT I – FRAUD BY OMISSION

204.    Plaintiff re-alleges paragraphs 1-203.

205.    At the time NACM distributed the Offering Memorandum to American Bank and the Participant Banks, Mercantile Bank knew that Pearlman had falsified his personal financial information contained in the Offering Memorandum and that the information in the Offering Memorandum concerning TCA stock, financial status, and business operations was false.

206.    The information of which Mercantile Bank was aware is listed in detail in paragraphs 63 through 67 and 94 through 100 of this complaint.

207.    Mercantile Bank was in a special position to know the facts referenced in paragraphs 63 through 67 and 94 through 100 of this complaint based on its previous relationship with Pearlman and TCA, and because it had conducted an in-depth

investigation far beyond the industry standard due diligence lenders perform before making loans.

208.    The information known by Mercantile Bank was not readily available to American Bank and the Participant Banks.

209.    Mercantile Bank knew that the facts referenced in paragraphs 63 through 67 and 94 through 100 were material and that other lenders, including American Bank, would not enter into any loan agreements with the Borrowers if it knew of those facts.

210.    Mercantile Bank knew that American Bank would enter a loan agreement with the Borrowers based on the presumption that the facts referenced in paragraphs 63 through 67 and 94 through 100 of this complaint did not exist.

211.    Based on the industry standard due diligence it conducted when it loaned money to Pearlman and TCA which did not detect Pearlman's fraud, Mercantile Bank knew that the due diligence performed by American Bank and the Participant Banks would not detect Pearlman's fraud.

212.    Mercantile Bank participated in the Multiple-Advance Term Loan to fulfill the lending requirements of the Offering Memorandum and to offer legitimacy to the loan as a long-standing lender to Pearlman and his related entities.

213.    Mercantile Bank knew that most of its fellow participants, including American Bank, did not have a prior relationship with Pearlman.

214.    As a participant in the loan and because it possessed special knowledge, Mercantile Bank had a duty to communicate these material facts to American Bank and the participants.

215.   Mercantile Bank further had a duty to communicate the material facts it learned regarding Pearlman, TCA, and the TCA stock to American Bank because Mercantile Bank's participation in the Loan, its representations in connection with that Loan as reflected in the Participation Agreement, its release of the TCA stock—including its temporary retention of an interest following the initial funding, and its acceptance of the stock as collateral on the Loan in connection with its participation—constituted statements by Mercantile Bank regarding the validity of the Loan, the validity of the information in the Offering Memorandum, and the validity of the collateral securing that Loan.

216.   Having spoken through its participation and release and subsequent acceptance of TCA stock as collateral, Mercantile Bank owed American Bank and the Participant Banks a duty to provide sufficient information so that its statements would not be misleading.

217.   However, Mercantile Bank intentionally withheld the information and participated in the Loan as if the Loan was valid to conceal the facts referenced in paragraphs 63 through 67 and 94 through 100 of this complaint which would allow Mercantile Bank's $13 million in loans to Pearlman and TCA to be fully satisfied by American Bank.

218.   Mercantile Bank further intended to conceal the facts referenced in paragraphs 63 through 67 and 94 through 100 of the complaint so that it could negotiate an early pay-off of its participation amount from the Multiple-Advance Term Loan.

219.   American Bank entered the Multiple-Advance Loan Agreement with the Borrowers based on the presumption that Mercantile Bank's representations embodied in

its decision to participate, in the Participation Agreement, and in its release and subsequent re-acceptance of TCA stock as collateral were true.

220. However, Mercantile Bank's partial statements were intentionally misleading as Mercantile Bank knew that the Offering Memorandum—and the financial information contained in that memorandum—was false and that the TCA stock was over pledged and did not adequately secure the Loan.

221. Mercantile repeated these omissions in connection with the amendment to the Participation Agreement which resulted in the release of all TCA stock by Mercantile Bank in connection with its prior loans to Pearlman and TCA and the final payment of all amounts owing to Mercantile Bank by American Bank under the Multiple-Advance Term Loan.

222. As a result of these misrepresentations and omissions, American Bank has suffered damages in excess of $36,000,000.

## COUNT II – FRAUD

223. Plaintiff re-alleges paragraphs 1-222.

224. At the time of the Multiple-Advance Term Loan and Participation Agreement, and as detailed in paragraphs 128 through 181 above, Mercantile Bank made statements concerning the validity of the loan to Pearlman, the financial statements and information contained in the Offering Memorandum, and the validity of the TCA stock to serve as collateral on any loan.

225. Mercantile Bank participated in the loan so that American Bank and the Participant Banks would not question the validity of the loan or the reasons Mercantile Bank desired to eliminate all outstanding obligations owing from Pearlman and TCA.

226.   Without Mercantile Bank's participation, the Multiple-Advance Term Loan would not have funded.

227.   American Bank relied on the statements by Mercantile Bank, including its participation in the Loan.

228.   Mercantile Bank intended American Bank to rely on its participation and other statements in connection with the Loan.

229.   American Bank's reliance on Mercantile Bank was reasonable.

230.   Based on its detrimental reliance, American Bank suffered damages in excess of $36,000,000.

## COUNT III – CIVIL CONSPIRACY TO COMMIT FRAUD

231.   Plaintiff re-alleges paragraphs 1-230.

232.   Pearlman, acting individually and on behalf of the Borrowers, was engaged in a massive fraud against individuals and financial institutions, including American Bank.

233.   As part of that fraud, Pearlman caused false and otherwise fraudulent information to be distributed to financial institutions in connection with requests for loans from those institutions.

234.   Pearlman, acting individually and on behalf of the Borrowers, provided false and otherwise fraudulent information to American Bank in an effort to induce American Bank to enter the Multiple-Advance Term Loan Agreement.

235.   Pearlman defrauded American Bank in connection with Multiple-Advance Term Loan Agreement.

236. Pearlman pled guilty to operating a Ponzi scheme to defraud individuals and financial institutions and is serving a 25 year prison sentence.

237. Mercantile Bank conspired with Pearlman to conceal the fraudulent information contained in the information provided to American Bank in connection with the Multiple-Advance Term Loan.

238. Mercantile Bank's conspiratorial acts included:

a. Failing and refusing to disclose to American Bank or any regulatory entity the myriad falsehoods perpetrated by Pearlman in connection with his loans with Mercantile Bank and American Bank;

b. Refusing to accelerate Pearlman's loans and/or take legal against Pearlman so as to avoid public disclosure of the information learned during the investigation of NFC Global;

c. Entering into a Forbearance Agreement with Pearlman that, although appearing legitimate on its face, was predicated on misrepresentations of which Mercantile Bank was well aware;

d. Deferring any enforcement actions based on Pearlman's representations that he was attempting to refinance his obligations to Mercantile Bank through other lenders;

e. Failing to foreclose on TCA stock;

f. Preparing a Loan Presentation Report maintained in Pearlman's loan file at Mercantile Bank which omitted all reference to the information learned from NFC Global;

38

g.      Entering into an agreement with Pearlman to participate in any loan if he was able to secure refinancing;

h.      Participating in the Multiple-Advance Term Loan;

i.      Making false representations concerning its due diligence in connection with the Participation Agreement;

j.      Releasing the TCA stock which served as collateral on its loans so that it could be taken as collateral on the Multiple-Advance Term Loan;

k.      Accepting, as a participant, the TCA stock as security on the Multiple-Advance Term Loan even though it knew the stock was over pledged and that TCA's financials were prepared by fictitious accounting firms and related to fictitious aircraft;

l.      Maintaining its silence in connection with the Amendment to the Participation Agreement;

m.      Obtaining payment from American Bank of all amounts owing to Pearlman; and

n.      Allowing additional funds to be released to Pearlman on false representations by Pearlman.

239.   Mercantile Bank engaged the acts set forth above to conceal Pearlman's fraud from regulators and fellow financial institutions and avoid any public disclosure of the information it learned from NFC Global.

240.   If Mercantile Bank had disclosed Pearlman's fraud, Pearlman would have been unable to refinance his debt—either because regulators would have forced Mercantile Bank to take action or because American Bank and the Participant Banks

would not have agreed to make the loans—and Mercantile Bank would have lost its entire outstanding balance of $13 million.

241.   As a result of Mercantile Bank's conspiracy with the Borrowers to fraudulently induce American Bank to enter into the Multiple-Advance Term Loan Agreement, American Bank has suffered damages in excess of $36,000,000.

## COUNT IV – COMMON LAW AIDING AND ABETTING

242.   Plaintiff re-alleges paragraphs 1-241.

243.   As described above, Pearlman and the Borrowers fraudulently induced American Bank to enter the Multiple-Advance Term Loan Agreement, causing American Bank substantial damages.

244.   Based on its previous relationship with Pearlman and his entities and its subsequent investigation of Pearlman and TCA, Mercantile Bank knew that Pearlman and the Borrowers provided fraudulent information to American Bank in connection with the Offering Memorandum.

245.   By concealing its knowledge concerning Pearlman's and the Borrowers' fraudulent information and omissions, Mercantile Bank substantially assisted Pearlman and the Borrowers in their fraudulent activity, knowing that concealing its knowledge would enable and encourage Pearlman and the Borrowers in the commission of their fraudulent activity.

246.   As a result of Mercantile Bank's aiding and abetting Pearlman's and the Borrowers' fraudulent activities, American Bank has suffered damages in excess of $36,000,000.

## COUNT V – BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING

247.   Plaintiff re-alleges paragraphs 1-246.

248.   American Bank and the Participant Banks entered the Loan Participation and Servicing Agreement with Mercantile Bank, which was an enforceable contract.

249.   All contracts in Minnesota contain an implied obligation and duty to act in good faith and fair dealing with the other parties to the contract.

250.   Mercantile Bank violated its duty of good faith and fair dealing by concealing its knowledge concerning Pearlman's and the Borrowers' fraudulent activities, as described above, which materially affected the terms of the parties' contract.

251.   As a result of Mercantile Bank's breach of its duty of good faith and fair dealing, American Bank has suffered damages in excess of $36,000,000.

## COUNT VI – BREACH OF CONTRACT

252.   Plaintiff re-alleges paragraphs 1-251.

253.   Mercantile Bank made representations in the parties' Participation Agreement regarding its due diligence and credit analysis, its ability to participate on the loan, and the collateral offered by Pearlman.

254.   These representations were false.

255.   Mercantile Bank's misrepresentations constitute a breach of the Participation Agreement.

256.   As a result of Mercantile Bank's breach of the Participation Agreement, American Bank and the Participant Banks has suffered damages in excess of $36,000,000.

## COUNT VII – PUNITIVE DAMAGES

257.    Plaintiff re-alleges paragraphs 1-256.

258.    Based on the NFC Global investigation, Mercantile Bank learned that Pearlman was engaged in fraud with respect to his loans with Mercantile Bank.

259.    The information Mercantile Bank learned from NFC Global concerning Pearlman and TCA is listed in paragraphs 63 through 67 and 94 through 100 of this complaint.

260.    Based on the NFC Global investigation, Mercantile Bank knew that information concerning Pearlman and TCA that was contained in the Offering Memorandum circulated by NACM for the proposed $28.5 million loan was false.

261.    Mercantile Bank knew that American Bank and the other participants would rely on the Offering Memorandum to make lending decisions.

262.    Mercantile Bank knew that the information it learned from NFC Global was material to American Bank and the other participants, that the information was not readily available and that American Bank and the other participants would not uncover Pearlman's fraud through ordinary due diligence.

263.    Mercantile Bank intentionally concealed and withheld material information from American Bank concerning Pearlman and TCA that, if known, would have prevented American Bank from making any loan to Pearlman.

264.    Mercantile Bank participated in the loan and intentionally failed to disclose this information so that Pearlman could obtain new financing and use that financing to satisfy his debts with Mercantile Bank.

42

265. In connection with its participation, Mercantile Bank also made misrepresentations as set forth in paragraphs 145 through 153 and 160 through 169 of this complaint.

266. Upon learning of Pearlman's bank fraud, Mercantile Bank agreed to enter a forbearance agreement with Pearlman and Trans Continental Airlines instead of instituting legal action against them.

267. At Pearlman's request, Mercantile Bank further agreed to participate in the $28.5 million loan.

268. Without Mercantile Bank's participation, the loan would not have closed.

269. Mercantile Bank agreed to forbear on its legal remedies and participate in the loan solely so that its loans to Pearlman and Trans Continental Airlines could be satisfied through a new lender.

270. Mercantile Bank acted with deliberate disregard for the rights of American Bank because it had knowledge of facts or intentionally disregarded facts concerning Pearlman and TCA, and intentionally concealed and withheld those facts from American Bank, which created a high degree of probability of injury to the rights of American Bank.

271. Mercantile Bank deliberately proceeded to act, by failing to disclose to American Bank the facts it knew concerning Pearlman and TCA, in conscious and intentional disregard of the high degree of probability of injury to the rights of American Bank.

43

272.    Further, Mercantile Bank deliberately proceeded to act with indifference, by failing to disclose to American Bank the facts it knew concerning Pearlman and TCA, to the high degree of probability of injury to the rights of American Bank.

273.    Pursuant to Minn. Stat. Ann. §§ 549.191 and 549.20, American Bank is entitled to an award of punitive damages based on Mercantile Bank's deliberate disregard for the rights of American Bank.

## PRAYER FOR RELIEF

WHEREFORE, American Bank requests that this Court enter judgment in its favor and against Mercantile Bank as follows:

1.    Awarding Plaintiff its actual damage, which are in excess of $36,000,000;

2.    Awarding Plaintiff punitive damages;

3.    Awarding Plaintiff its costs and reasonable disbursements; and

4.    Any other relief the Court deems appropriate.

DATED: March 2, 2010                     **LINDQUIST & VENNUM P.L.L.P.**

By  s/ Eric J. Nystrom
Eric J. Nystrom, #19489x
enystrom@lindquist.com
William P. Wassweiler, #232348
wwassweiler@lindquist.com
John C. Ekman, #276480
jekman@lindquist.com
Anthony N. Kirwin, #387847
akirwin@lindquist.com

4200 IDS Center
80 South Eighth Street
Minneapolis, MN 55402-2274
(612) 371-3211
(612) 371-3207 (facsimile)

**Attorneys for Plaintiff American Bank**

3132379.1