## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

American Bank of St. Paul,

|  |  |
|---|---|
| Plaintiff, | **MEMORANDUM OPINION** |
|  | **AND ORDER** |
| v. | Civil No. 09-2240 ADM/TNL |

TD Bank, N.A.,

Defendant.

_____

Eric J. Nystrom, Esq., Anthony N. Kirwin, Esq., Daniel N. Sacco, Esq., John C. Ekman, Esq., and William P. Wassweiler, Esq., Lindquist & Vennum PLLP, Minneapolis, MN, on behalf of Plaintiff.

Alan L. Kildow, Esq., David M. Doyle, Esq., Jeffrey E. Mitchell, Esq., Robert J. Pratte, Esq., and Sonya R. Braunschweig, Esq., DLA Piper LLP, Minneapolis, MN and San Francisco, CA, and Eric S. Golden, Esq., Howard S. Marks, Esq., Jennifer B. Kimble, Esq., and Joe A. Joseph, Esq., Burr & Forman LLP, Orlando and Winter Park, FL and Birmingham, AL, on behalf of Defendant.

_____

## I.  INTRODUCTION

On February 25, 2011, the undersigned United States District Judge heard oral argument on Defendant TD Bank, N.A.'s Motion for Summary Judgment [Docket No. 84].  Plaintiff American Bank of St. Paul ("American Bank") opposes the motion.  For the reasons set forth below, the motion is granted in part and denied in part.

## II.  BACKGROUND[1]

Defendant TD Bank, N.A.  ("Mercantile") does business as Mercantile Bank throughout Florida.  First Am. Compl. [Docket No. 44] ¶¶ 2-3.  Plaintiff American Bank is a Minnesota

---

[1] On a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party.  Ludwig v. Anderson, 54 F.3d 465, 470 (8th Cir. 1995).

bank headquartered in St. Paul, Minnesota.  <u>Id.</u> ¶ 1.  This case concerns a $28.5 million Multiple-Advance Term Loan Agreement (the "Loan Agreement") between American Bank as lender and Louis Pearlman ("Pearlman"), Trans Continental Records, Inc., and TOTP, LLC as borrowers. <u>Id.</u> ¶ 139.

Pearlman was well-known in Southern Florida as a successful businessman, having promoted prominent "boy bands" such as 'N Sync and the Backstreet Boys.  <u>See</u> Kildow Aff. [Docket No. 87] Louis Pearlman Deposition ("Pearlman Dep.") at 13-14.  Pearlman had a banking relationship with Mercantile dating back to 2001.  First Am. Compl. ¶ 9.  At one time, Pearlman had several depository accounts with Mercantile with balances of more than $4 million.  <u>Id.</u> ¶ 12.  Mercantile also extended loans to Pearlman exceeding $17 million, including a $6 million revolving line of credit extended in February 2004.  Appendix to Mem. in Opp. to Mot. for Summ. J. ("App'x to Opp. Mem.") [Docket Nos. 90-102] Ex. 99.  The $6 million line of credit was secured by collateral, including shares of Trans Continental Airlines ("TCA") stock. <u>Id.</u>

In February 2005, the $6 million line of credit came due, and Pearlman proposed consolidating all his loans with Mercantile, including the line of credit obligation, into a single note.  App'x to Opp. Mem. Ex. 119.  Mercantile then identified information it needed to consider the request, and extended, and would later re-extend, the due date of the line of credit obligation to give the parties time to negotiate a new agreement.  <u>Id.</u>; App'x to Opp. Mem. Ex. 277.  By August 2005, Pearlman had not responded to many of Mercantile's information requests.  <u>See</u> App'x to Opp. Mem. Ex. I, Barbara Bytell Deposition ("Bytell Dep.") at 147-150.

After Pearlman failed to provide the information sought by Mercantile, Mercantile began its own investigation.  <u>Id.</u> at 151.  From public records, Mercantile soon discovered that Cohen &

Siegel, the accounting firm that purportedly prepared TCA's financial statements, was not licensed in Florida as represented.  App'x to Opp. Mem. Ex. 46.  Mercantile then retained NFC Global ("NFC") to investigate further.  Bytell Dep. at 161.  NFC's investigation found no professional licensing or registration for Cohen & Siegel in Florida or New York, where it purportedly had offices, and no listing in Germany, where the firm purportedly was headquartered.  App'x to Opp. Mem. Ex. 10.  NFC then prepared a due diligence report for Mercantile.  See generally Kildow Aff. Ex. 11.  The NFC report included the discovery that no aircraft were directly registered to TCA, but some were registered to subsidiaries or affiliates, and NFC was unable to find any licensing or registration for Cohen & Siegel, or its principals Arthur Siegel and Stanley Kaplan, in the United States or Germany.  Kildow Aff. Ex. 11 at NFC000115-16, NFC000126.  Mercantile then prepared an internal memorandum detailing the financial information provided by Pearlman that it could not verify, including $145 million in cash and equivalents held by TCA, the memorandum also reflected that Pearlman's financial statement omitted some $35.5 million in liabilities that it had confirmed.  See App'x to Opp. Mem. Ex. 205.

On August 29, 2005, after this investigation, Mercantile declared Pearlman in default on the line of credit.  App'x to Opp. Mem. Ex. 246.  Mercantile then met with Pearlman privately on September 7, 2005.  See id.  Mercantile met with Pearlman again in late September, where he represented that he could not immediately repay his Mercantile loans without it getting "very messy" and opening "a can of worms."  Pearlman Dep. at 116-17, 157-59.  However, Pearlman claimed that with more time and debt restructuring, he would be able to repay the Mercantile loans.  Id. at 97-99.  Mercantile then agreed to enter into a forbearance agreement (the "Forbearance Agreement") with Pearlman.  See App'x to Opp. Mem. Ex. 242.  The documents

3

requesting approval from Mercantile executives for the Forbearance Agreement used the suspect financial information supplied by Pearlman.  App'x to Opp. Mem. Ex. 50.

North American Capital Markets ("NACM") then began working on behalf of Pearlman to obtain a new loan that would satisfy Pearlman's debts to Mercantile and secure rights to a popular British music television program.  See Pearlman Dep. at 135.  NACM circulated an Offering Memorandum to several banks, including Mercantile.  See App'x to Mem. Opp. Ex. 259.  The Offering Memorandum included representations that Mercantile had previously been unable to verify, including (1) TCA held cash and equivalents of $145 million and (2) TCA owned eight aircraft.  App'x to Opp. Mem. Ex. 259 at MERC.AB001800-01.  The Offering Memorandum also included statements from Cohen & Siegel and Stanley Kaplan, and omitted mention of the $35.5 million in liabilities of which Mercantile had knowledge.  Id. at MERC.AB001809-10, MERC.AB001827-28, MERC.AB001876-1907.  Additionally, the Offering Memorandum expressly stated that its purpose was to "refinance existing debt and to purchase rights to . . . 'The Top Of The Pops.'"  Id. at MERC.AB001790.

In response to the Offering Memorandum, a loan syndicate was formed with American Bank to act as the servicing bank.  See Kildow Aff. Ex. 12.  Several banks agreed to purchase shares, but as Pearlman's forbearance period with Mercantile expired, NACM had insufficient commitments to close the deal.  See App'x to Opp. Mem. Ex. 57.  During this time of soliciting financing, Mercantile made no disclosure of its knowledge regarding the lack of registration and licensing of Cohen & Siegel, Stanley Kaplan, or TCA's aircraft.  Throughout the process, NACM solicited Mercantile's participation, but received no commitment.  App'x to Opp. Mem. Ex. M, Andrew Cheney Deposition ("Cheney Dep.") at 150.  With the transaction still lacking the necessary funds, Mercantile agreed to purchase a share as a participating bank to close the

deal.  See Kildow Aff. Ex. 12 at Ex. A.  Mercantile's participation, in light of its knowledge of

the problems with the Offering Memorandum, violated its own underwriting standards.  App'x to

Opp. Mem. Ex. U, James McRae Deposition ("McRae Dep.") at 188.  The deal closed on March

28, 2006, when Pearlman and American Bank executed the Loan Agreement and a promissory

note (the "Note"), and the participating banks signed a participation agreement (the

"Participation Agreement").  Pursuant to the Loan Agreement, Pearlman pledged stock in TCA

as collateral, which had previously been pledged to Mercantile and required Mercantile to

release its security interests in that stock.  See App'x to Opp. Mem. Ex. 194.  As part of the

Participation Agreement, Mercantile's interest would be reduced to $0 as participation funds

were advanced to Pearlman.  See Kildow Aff. Ex. 12 at 1.

By April 2006, the loan was distributed and Mercantile was paid.  First Am. Compl. ¶¶

170-73.  In December 2006, Pearlman and the other debtors defaulted on the loan.  Id. ¶ 176.

Pearlman was then discovered to have misled other lenders and investors and defaulted on over

$300 million in obligations.  He eventually pled guilty to fraud and other crimes and is currently

serving a 25-year prison sentence.  On August 26, 2009, American Bank commenced this action,

and Mercantile now moves for summary judgment on all claims.

### III.  DISCUSSION

**A.      Summary Judgment Standard**

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall issue "if the

pleadings, depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any, show that there is no genuine issue as to any material fact and that the moving

party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); see Matsushita Elec.

Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Anderson v. Liberty Lobby, Inc.,

477 U.S. 242, 252 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). On a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party. Ludwig, 54 F.3d at 470. The nonmoving party may not "rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial." Krenik v. County of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995).

### B.     Fraud by Omission

American Bank asserts a claim for fraud by omission against Mercantile, arguing that Mercantile had a duty to disclose its knowledge about Pearlman to American Bank. Under Minnesota law, which the parties agree governs this dispute, a party to a commercial transaction has a duty to disclose information only in the following limited circumstances: (1) one who speaks must say enough to prevent his words from misleading the other party; (2) one who has special knowledge of material facts to which the other party does not have access may have a duty to disclose these facts to the other party, (3) one who stands in a confidential or fiduciary relation to the other party must disclose material facts. Klein v. First Edina Nat'l Bank, 196 N.W.2d 619, 622 (Minn. 1972).

It is undisputed that the first and third circumstances requiring disclosure do not apply here; the parties only dispute whether Mercantile's knowledge amounted to "special knowledge of material facts to which the other party does not have access." The parties' dispute focuses on the proper standard for what constitutes "special knowledge of material facts." Mercantile argues that in the context of banking, it has a duty to disclose only actual knowledge of "irretrievable insolvency." See Richfield Bank & Trust Co. v. Sjogren, 244 N.W.2d 648, (Minn. 1976) ("If . . . a party is so insolvent that he has no reasonable expectation of fulfilling his contract obligations, then it is fraud for that party to fail to disclose his insolvency before

entering the contract."); Boubelik v. Liberty State Bank, 553 N.W.2d 393, 401 (Minn. 1996) ("[W]hen a bank has knowledge of a customer's irretrievable insolvency, that is, knowledge of a customer's inability to meet obligations, there is a bright line standard of the duty to disclose information regarding the customer's financial condition . . . ."). In opposition, American Bank contends that a bank has a duty to disclose whenever it has actual knowledge of "fraudulent activities." Richfield Bank, 244 N.W.2d at 652 ("[W]e hold that under the unique and narrow 'special circumstances' of this case, in which the bank had Actual [sic] knowledge of the fraudulent activities of one of its depositors, it had an affirmative duty to disclose those facts . . . .").

Indeed, the directive from Minnesota courts is unclear. On one hand, Boubelik disclaims that it holds that "only knowledge of irretrievable insolvency must be disclosed." Boubelik, 553 N.W.2d at 399 (quotations in original). On the other hand, Boubelik states that "a clear standard with regard to a bank's duty to disclose the financial condition of its customer is necessary" and that clear standard is "knowledge of irretrievable insolvency." Id. at 400. Given these seemingly inconsistent holdings, the parties robustly argue each position.

The uncertainty of how Boubelik applies to this case, however, is not surprising. This case does not present the situation confronted in Boubelik, Richfield Bank, and other related cases, where a bank is privy to "special knowledge" due to its relationship with its customer. Rather, this case has a fact pattern where a bank possesses "special knowledge" due to its own investigative efforts. Therefore, this case turns not on what type of knowledge a bank must disclose, the issue discussed at length in Boubelik and Richfield Bank, but instead turns on whether Mercantile's knowledge was from such sources as to make it "readily ascertainable" for American Bank. See id. at 400 (noting that bank had no duty to disclose information that was

7

"readily ascertainable").

Under Minnesota law, "special knowledge" must be disclosed only when it is knowledge "to which the other party does not have access." Klein, 196 N.W.2d at 622. This means that the knowledge must not be "readily ascertainable," but must be peculiarly within the defendant's knowledge. Boubelik, 553 N.W.2d at 400. In this context, "readily ascertainable" means available through "ordinary channels." Ohio Cas. Grp. v. Salo, No. C3-97-776, 1997 WL 739331, *3 (Minn. Ct. App. Dec. 2, 1997).

Mercantile had no duty to disclose its knowledge, whether special knowledge or not, because the knowledge it possessed was readily ascertainable through ordinary channels. The evidence of record is that Mercantile became suspicious of Cohen & Siegel because it could not find professional licensing for that entity or its principals. That information is publicly available and was accessed by Mercantile through routine searches of public records. App'x to Opp. Mem. Ex. 46. Mercantile then retained FCA, which used typical investigatory means to search public information for professional credentials for Cohen & Siegel and for aircraft registration for TCA. Kildow Aff. Galen R. Clements Deposition ("Clements Dep.") at 19, 26-27, 31-33, 35-38. There is nothing extraordinary about Mercantile retaining a private investigation firm or the methods the firm used to conduct its investigation.

American Bank argues that whether or not the information was "readily ascertainable," Mercantile Bank had a duty to disclose actual knowledge of fraudulent activities, again citing Richfield Bank. This is not the law; knowledge must be disclosed only where it is "peculiarly" in the possession of a party. Richfield Bank, 244 N.W.2d at 650 (citing Thomas v. Murphy, 91 N.W. 1097, 1098 (1902)). In Richfield Bank and Boubelik, the actual knowledge of fraud was peculiarly in the possession of the depository bank because the depository bank had access to the

depositor's account information that showed irretrievable insolvency.  Here, the depository bank, Mercantile, gained its knowledge not through access to confidential account information but rather through conducting an investigation to obtain further information.  This information was not "peculiarly" in its knowledge; had any other bank conducted a similar investigation, it would have uncovered the same information.

Next, American Bank argues that Mercantile was peculiarly in possession of some knowledge that was not "readily ascertainable"–namely the existence of the Forbearance Agreement and the earlier declaration of default on the $6 million line of credit.  However, the Offering Memorandum made no misrepresentations regarding this knowledge.  The Offering Memorandum stated that Pearlman's loans were "paid as agreed."  The Forbearance Agreement was a modification of the prior contract between Mercantile and Pearlman, and because it was not in default, that statement was not false.  See Blake v. J. Neils Lumber Co., 127 N.W. 450, 515 (Minn. 1910) (noting that after modification, all rights and liabilities of parties to contract are controlled by the new agreement).  Therefore, under any standard of disclosure, Mercantile did not have a duty to disclose information regarding the forbearance agreement or the default on the $6 million line of credit.

Finally, American Bank argues that the information obtained by NFC was not "readily ascertainable" because an NFC investigator acknowledged that it was not "generally available" and that many of the databases used were accessible only by subscription.  See App'x to Opp. Mem. Ex. N, Clements Dep. at 49.  "Readily ascertainable" does not mean that available free of charge.  "Readily ascertainable" means that information is available through "ordinary channels."  American Bank has adduced no evidence that NFC was privy to information that could not be obtained through "ordinary channels."  See Ohio Cas. Grp., 1997 WL 739331 at *2-

9

3 (holding that employment status information was "readily ascertainable" through "ordinary channels" because insurance company could have asked employer about insured's employment). Any knowledge of Pearlman's fraud obtained by Mercantile was "readily ascertainable" to the other participating banks, and Mercantile had no duty to disclose it.  Mercantile's decision to go beyond normal due diligence, and hire a private firm as the most cost-effective way of doing so, does not negate that the evidence is Mercantile used ordinary channels in its investigation. Mercantile is entitled to summary judgment in its favor on American Bank's fraud by omission claim.

### C.       Fraudulent Misrepresentation

To prevail on a claim for fraud, a plaintiff must show: (1) a false representation of a past or present material fact which was susceptible of knowledge, (2) the defendant knew the representation was false or made it without knowing whether it was true or false, (3) an intention to induce plaintiff to act in reliance on the misrepresentation, (4) and resulting damages. Karlstad State Bank v. Fritsche, 392 N.W.2d 615, 618 (Minn. 1986).  Representations may be implied from conduct.  Brainerd Dispatch Newspaper Co. v. Crow Wing Cnty., 264 N.W. 779, 780 (Minn. 1936).

American Bank's fraud claim fails because Mercantile made no affirmative representations.  American Bank identifies only two affirmative acts that it claims form the basis of an actionable fraud claim.  First, American Bank argues that by participating in the transaction Mercantile made the implied representation that the information in the Offering Memorandum was true.  This position is unavailing.  The Offering Memorandum was a representation made by Pearlman, not Mercantile.  Mere participation in the loan is not sufficient conduct to represent that information in the Offering Memorandum was true.  Otherwise, each participating bank

would have a cause of action against all others predicated solely on their participation, an untenable position.  Each party to an agreement enters the transaction at its own peril, with an independent duty of diligence.  <u>See</u> Kildow Aff. Ex. 12 § 10; <u>Leonard v. Dorsey & Whitney, LLP</u>, 553 F.3d 609, 626 (8th Cir. 2009) (noting that banks are sophisticated entities with the duty to make their own evaluations of participation loans).

No courts have held that the act of contracting is a representation endorsing the representations of another regarding the contract, especially as here where the seller, American Bank, urges the Court to imply a representation concerning the product sold by the buyer, Mercantile.  The only cases cited by American Bank allowing representations to be implied from the mere act of contracting are cases holding that contracts for the issuing of securities implicitly represent that the issued securities are valid.  <u>See</u> <u>Stern v. Nat'l City Co.</u>, 25 F. Supp. 948, 957 (D. Minn. 1981); <u>Hutchings v. Tipsword</u>, 363 S.W.2d 40, 45 (Mo. Ct. App. 1963).  It is reasonable to imply that the performance promised by a contracting party for issuance of securities will indeed be what it purports to be.  However, in the sales context of the instant case, it is unreasonable to imply assurances by a buyer to a seller, regarding the product sold, from the mere act of contracting, as urged by American Bank here.

Second, American Bank argues that the Mercantile's release of its security interest in TCA stock so that it could be used as collateral for the participating banks was an implied representation that the stock had positive value.  Again, this position is untenable.  First, assuming *arguendo* that the TCA stock was worthless, no evidence of record indicates that Mercantile knew it to be worthless.  Mercantile suspected that TCA did not have proper licensing or own any aircraft.  However, that knowledge might lead it to suspect that TCA stock had less than its stated value, not zero value, as TCA could have held other assets.  Second,

11

Mercantile's act of releasing its security interest in the stock to allow Pearlman to pledge it to the participating banks is not a representation that the stock has any value; Mercantile was not issuing the stock, it merely released its interest in that stock.  The implication that can be taken from that conduct is that the stock was less valuable as collateral for the $6 million line of credit than Mercantile initially believed.

### D.      Breach of Contract

American Bank claims that Mercantile breached two provisions of the Participation Agreement by making two false warranties.  The representations that American Bank argues were breached are § 10(c) and § 10(f).  In § 10(c) Mercantile "warrant[ed], represent[ed], acknowledge[d], and certif[ed]" that "it has received such financial and other information with respect to [Pearlman, etc.] and the loan transaction contemplated hereby as in its opinion is necessary or desirable to permit it to make an informed credit decision with respect to the purchase of its respective participating ownership interest."  Kildow Aff. Ex. 12 § 10(c).  Section 10(f) is a representation that Mercantile "is relying on its own due diligence, credit investigation and credit analysis, and not on any representations, warranties or statements of [American Bank] . . . ."  Id. § 10(f).  As a matter of law, Mercantile breached neither provision.

First, American Bank has adduced no evidence that the representation in § 10(c) was false.  To be sure, American Bank argues and has presented evidence that Mercantile did not follow its internal policies.  However, deviating from its internal policies does not mean that Mercantile did not hold the opinion that it had information sufficient to make an informed decision.  To the contrary, the evidence of record indicates that Mercantile's decision was highly informed–it secured additional information that led to its decision to reduce its lending exposure to Pearlman.  There is no genuine issue of material fact regarding whether Mercantile held the

opinion that it was making an informed decision.

Further, American Bank has adduced no evidence that Mercantile did not base its decision to participate in the Loan based on "due diligence, credit investigation and credit analysis." Nothing about that representation is false. Again, all evidence of record supports that Mercantile conducted its own diligence and investigation of Pearlman, and based on that information decided to reduce its loan exposure with him. Based on that investigation and analysis, Mercantile concluded that Pearlman would be able to repay his obligations only with debt restructuring and additional time. As such, Mercantile agreed to a forbearance and then to participation in the Participation Agreement. No genuine issue of material fact exists as to whether Mercantile conducted its own investigation and analysis; it did. Mercantile breached no representations and is entitled to summary judgment on the breach of contract claims.

### E.        Aiding and Abetting

American Bank also asserts a claim against Mercantile for civil aiding and abetting. A plaintiff can prevail on such a claim if it shows: (1) a tort by another that causes injury to the plaintiff, (2) actual knowledge of the defendant that the tortfeasor's conduct constituted a breach of duty, and (3) substantial assistance by the defendant. Witzman v. Lehrman, Lehrman & Flom, 601 N.W.2d 179, 187 (Minn. 1999). The second and third elements are analyzed in tandem; for example, a minimal showing of substantial assistance requires a greater showing of knowledge. Id. at 188.

Pearlman has pled guilty to criminal fraud and admitted to making misrepresentations about his financial health to banks. Kildow Aff. Ex. 1 at 18. Based on those admissions, if American Bank reasonably relied on those misrepresentations and suffered damages, fraud was committed against American Bank by Pearlman. See Karlstad, 392 N.W.2d at 618 (listing

13

elements of fraud).  Therefore, a genuine issue of material fact exists with respect to the first element of this claim.

With respect to the actual knowledge element, actual knowledge was discussed above as it related to American Bank's fraud by omission claim.  That discussion, however, did not rule whether a genuine issue of material facts exists regarding Mercantile's actual knowledge of Pearlman's fraud because whatever knowledge Mercantile had was derived from sources readily available to American Bank and therefore did not trigger a duty of disclosure.  See Richfield Bank, 244 N.W.2d at 650 (noting that material facts must be disclosed only when "peculiarly" within a parties knowledge).  The issue of actual knowledge of fraud, however, is now squarely before the Court.

Actual knowledge is usually a question of fact, as it must be inferred from circumstantial evidence.  Krout v. Goemmer, 583 F.3d 557, 567 (8th Cir. 2009) (citing Farmer v. Brennan, 511 U.S. 825, 842 (1994)).  Here, American Bank has produced evidence that the Offering Memorandum contained false statements regarding Pearlman's financial health.  Further, American Bank has produced evidence that Mercantile conducted an investigation that failed to corroborate some of Pearlman's financial representations.  See App'x to Opp. Mem. Ex. 205. That same investigation produced information of some $35.5 million in liabilities not mentioned in the Offering Memorandum.  Id.  Further, when payment was sought from Pearlman, he warned that he would need more time or things would "get messy."  Pearlman Dep. at 116. When questioned about whether TCA could pay his debt, he responded that demanding payment from TCA would "open a can of worms."  Id. at 157.  Those statements, combined with the results of Mercantile's investigation, could lead a reasonable person to infer that Mercantile had

actual knowledge that Pearlman was committing fraud by circulating the Offering Memorandum. Therefore, a genuine issue of material fact exists regarding the second element of the claim.

With respect to the third element, substantial assistance is assistance that is a "substantial factor" in bringing about the ultimate tort.  K&S P'ship v. Continental Bank, N.A., 952 F.2d 971, 979 (8th Cir. 1991).  Whether an act was a "substantial factor" is analyzed under the rubric of proximate cause.  Id.  Here, Mercantile engaged in two overt acts of assistance: it released its interests in TCA stock and it purchased a $2 million share in the Loan Agreement.  American Bank has produced evidence that without Mercantile's participation in the Loan, the loan would not have closed and Pearlman would not have obtained the funds.  See McRae Dep. at 211. Further, given that Mercantile had seen the Offering Memorandum, it may have been foreseeable that Pearlman's fraud would be successful if Mercantile in fact participated in the loan.

Finally, Mercantile violated many of its own internal policies with respect to Pearlman. Conducting business in an atypical way is evidence of knowledge.  Metz v. Unizan Bank, No. 5:05 CV 1510, 2008 WL 2017574, *18 (N.D. Ohio May 7, 2008) (holding that atypical banking procedures, such as disregarding requirements for corporate authorization statements and valid signature cards, was sufficient to infer knowledge by bank of depositor's fraud).  With a high level of knowledge that Pearlman was engaging in fraud, a showing of a lower level of substantial assistance is sufficient for aiding and abetting liability.  Witzman, 601 N.W.2d at 188.   Therefore, a genuine issue of material fact exists regarding whether Mercantile provided substantial assistance to Pearlman.  As genuine issues of material fact exist with respect to each element of American Bank's civil aiding and abetting claim, summary judgment for this claim is denied.

### F.      Covenant of Good Faith and Fair Dealing

American Bank asserts a claim alleging breach of the implied covenant of good faith and

fair dealing.  The implied covenant of good faith and fair dealing requires that one party not

unjustifiably hinder the other party's performance of the contract.  In re Hennepin Cnty. 1986

Recycling Bond Litig., 540 N.W.2d 494, 502 (Minn. 1995).  The covenant is breached when a

party has an ulterior motive for its refusal to perform a contractual duty.  Minnwest Bank Central

v. Flagship Props. LLC, 689 N.W.2d 295, 303 (Minn. Ct. App. 2004).

Here, Mercantile did not refuse to perform its contractual duties; it fully paid its share

and released security interest in the collateral pursuant to the Participation Agreement.  In its

relationship with American Bank, Mercantile did nothing to inhibit performance of the

Participation Agreement.  The implied covenant of good faith and fair dealing cannot create

additional duties of disclosure as urged by American Bank.  See LaFleche v. Clark Prods., Inc.,

Civil No. 05-2549, 2007 WL 2023564, *10 (D. Minn. July 9, 2007) ("[Plaintiff] cannot use the

covenant of good faith and fair dealing to create new, specific contract terms that he simply

wished had been included in the [original contract].").  Therefore, Mercantile is entitled to

summary judgment on this claim.

### G.      Conspiracy

The final claim of American Bank is civil conspiracy.  "A conspiracy is a combination of

persons to accomplish an unlawful purpose or a lawful purpose by unlawful means."  Harding v.

Ohio Cas. Ins. Co., 41 N.W.2d 818, 824 (Minn. 1950).  The elements of a civil conspiracy are:

"(1) two or more persons, (2) an object to be accomplished, (3) a meeting of the minds on the

object or course of action to be taken, (4) the commission of one or more unlawful overt acts,

and (5) damages as the proximate result of the conspiracy."  In re Temporomandibular Joint

16

(TMJ) Implants Prods. Liab. Litig., 113 F.3d 1484, 1498 (8th Cir. 1997).  "No express or certain

agreement is necessary.  A common understanding to commit the wrong is enough, even though

the purpose and assignment of parts to the several actors be tacit."  Scheele v. Union Loan &

Fin. Co., 274 N.W. 673, 679 (Minn. 1937).

A genuine issue of material fact exists as to whether Mercantile and Pearlman reached a

"meeting of the minds" regarding Pearlman's alleged fraudulent activities.  Pearlman testified

that, based on Mercantile's changed posture regarding their banking relationship, he knew

Mercantile had become aware of at least some of his fraudulent dealings.  Pearlman Dep. at 118.

Pearlman had a private meeting with Mercantile employees Bruce May and Walt Ramsey to

discuss Pearlman's debts to Mercantile.  Id. at 96.  At that meeting, Pearlman stated that he

would need more time and debt restructuring in order to satisfy his obligations to Mercantile.  Id.

at 97-99.  Mercantile then entered into the Forbearance Agreement, using the documents it

suspected to be false to obtain corporate approval.  App'x to Opp. Mem. Ex. 50.  Pearlman then

hired NACM to solicit banks for the Participation Agreement using the Offering Memorandum,

which included the suspect documents.  While the Offering Memorandum was circulating,

Mercantile and NACM continued to discuss the extent of Mercantile's participation.  Cheney

Dep. at 150-51.  Finally, when the loan was unable to close, Mercantile agreed to enter as a

participating bank but on terms that allowed it to receive full payment almost immediately.

Mercantile argues that no meeting of the minds existed because a Forbearance

Agreement is a routine transaction that does not evince an unlawful plan.  This position misses

the point.  The Forbearance Agreement itself does not raise a genuine issue of material fact, but

the circumstances surrounding it do.  Pearlman testified that he suspected Mercantile knew of his

fraud.  Pearlman Dep. at 118.  Pearlman also testified that he told Mercantile that if it demanded

immediate payment things would "get messy" and it would "open a can of worms."  Id. at 116-17, 157-59.  In response, Mercantile used the documents it suspected to be false to obtain authorization for the Forbearance Agreements, in violation of its internal policies, and then agreed to enter the Participation Agreement, on terms allowing it to be paid almost immediately, knowing that those same suspect documents had been used to solicit the participating banks. From those specific facts a reasonable mind could infer that Mercantile and Pearlman had an tacit agreement that Pearlman would continue to use suspect documents to obtain loans to pay off Mercantile, and that Mercantile would assist by foregoing action against Pearlman and participating in the loan if necessary.  Genuine issues of material fact preclude summary judgment on American Bank's conspiracy claim.

###    H.    Damages

The parties vigorously dispute whether American Bank may recover the entire amount of the Loan, $28.5 million, or the amount it purchased, $5 million.  The only surviving claims here are civil aiding and abetting and civil conspiracy.  Under these theories of recovery, the underlying tortfeasor is jointly liable with his accomplice or co-conspirator.  Witzman, 601 N.W.2d at 185 (aider and abettor jointly liable with primary tortfeasor); 15A C.J.S. Conspiracy § 21 ("Parties to a civil conspiracy are joint tortfeasors; their liability is joint and several . . . ."). The cause of action underlying both claims is fraud.  Damages for fraud are generally the "out-of-pocket" losses sustained by a plaintiff.  LeSueur Creamery, Inc. v. Haskon, Inc., 660 F.2d 342, 346 (8th Cir. 1981).  In this case, each participating bank suffered out-of-pocket losses equal to its purchase of a participation share.  Further, each bank was given the Offering Memorandum that included Pearlman's misrepresentations.  Therefore, each participant bank has

the same claims as American Bank for aiding and abetting and conspiracy against Mercantile unless it has assigned its claims to American Bank.

Under Minnesota law, assignment occurs where the owner of a claim manifests an intent to transfer that claim without retaining control or power of revocation. Minn. Mut. Life Ins. Co. v. Anderson, 504 N.W.2d 284, 286 (Minn. Ct. App. 1993). The sole manifestation of an intent to transfer claims to American Bank identified by American Bank is the Participation Agreement. American Bank argues that under the Participation Agreement the participating banks agreed to purchase "the risks, liabilities and expenses . . . arising or incurred under or in connection with the Note, the Loan Agreement or the other documents executed therewith, including the risks of non-payment, late performance or non-performance by the Borrower thereunder and of disputes or litigation relating thereto." American Bank argues this language is the manifestation of an intent to have American Bank assert claims on behalf of the participating banks in this litigation.

While the Participation Agreement allows American Bank to assert the participating banks' claims arising from the Note or Loan Agreement on their behalf, it does not authorize American Bank to assert their claims for aiding and abetting or civil conspiracy against Mercantile. The language does not manifest an intent for American Bank to assert all tort claims against any party on behalf of the participating banks. The language does not speak of claims, sounding in tort or otherwise, but rather identifies the loan documents and the risks associated with default. See Kildow Aff. Ex. 12 § 1(d). The contract language, therefore, is limited to recovery from Pearlman, or the other borrowers, based on default on the Loan and Note. This reading is bolstered by § 4 of the contract, that discusses the manner in which American Bank can bring claims. While American Bank is correct that the section does not itself assign claims,

19

contracts must be construed as a single instrument, and that section clarifies the scope of the assignment found in section 1. See Halla Nursery, Inc. v. City of Chanhassen, 781 N.W.2d 880, 884 (Minn. 2010) ("[T]he terms of a contract are not read in isolation.").

Further, in discerning contracting parties' intent, courts look to their subsequent conduct. Fredrich v. Independent School Dist. No. 720, 465 N.W.2d 692, 695 (Minn. 1991). Here, the participating banks have acted as if they did not assign their claims; executives at those banks have testified that the claims were not assigned. Further, American Bank has not acted as if the claims were assigned to it. The language American Bank identifies as an assignment, also authorizes American Bank to collect attorney's fees from the participating banks; yet, American Bank did not apprise many participating banks of the lawsuit and has not sought attorney's fees under § 1(d).

The conduct of the parties is also relevant in determining what preclusive effect will be given to this litigation. In determining whether a party is the real party in interest, courts generally follow the rule that if the litigation will be given res judicata effect in subsequent cases, the party asserting the claims is the real party in interest. See Anderson v. Conn. Fire Ins. Co., 43 N.W.2d 807, 814 (Minn. 1950). Res judicata operates only against a party to the litigation and its "privies." Rucker v. Schmidt, 794 N.W.2d 114, 117 (Minn. 2011). "Privity expresses the idea that as to certain matters and in certain circumstances persons who are not parties to an action but who are connected with it in their interests are affected by the judgment with reference to interests involved in the action, as if they were parties." Id. at 118 (quotations omitted). A person may be in privity with a party in at least three ways: (1) he can control the action even though not a party to it; (2) his interests can be represented by a party; or (3) he can

be a successor in interest, deriving his claim through a party to the prior action.  <u>Id.</u> (citing

<u>Margo-Kraft Distributors, Inc. v. Minneapolis Gas Co.</u>, 200 N.W.2d 45, 47-48 (Minn. 1972)).

Here, if American Bank were able to assert its claim for the entire $28.5 million, it would

likely not be given res judicata effect because the participating banks are not privies of American

Bank.  The participating banks have no control over this action, have no attorney-client

relationship with American Bank's counsel, and have no ability otherwise to influence American

Bank's litigation strategy.  The participating banks did not authorize American Bank to represent

their interests, and no evidence suggests that American Bank is doing anything other than

litigating entirely in pursuit of its own interests.  Finally, American Bank is not a successor in

interest to the participating banks' interests.

American Bank's argument that as a matter of law the lead bank in a participation loan is

the real party in interest is unavailing.  The rights of the banks are dictated by the Participation

Agreement.  <u>Leonard</u>, 553 F.3d at 626.  In support of its position, American Bank cites <u>Midland</u>

<u>Nat'l Bank v. Cousins Props., Inc.</u>, 68 F.R.D. 427 (N.D. Ga. 1975), where the court held that the

participating banks were not indispensable parties under Rule 19 of the Federal Rules of Civil

Procedure because the lead bank was the only real party in interest for asserting its fraud claims.

<u>Id.</u> at 430-31.  The <u>Midland</u> court noted that the participating banks did have an interest in the

promissory note and may have been able to assert any claims arising out of that instrument.  <u>Id.</u>

at 430.  Evidently, then, <u>Midland</u> involved an entirely different scenario than here.  There, the

participating banks could assert claims on the note, but the fraud was committed only against the

lead bank.  Here, the participating banks have assigned any claims for default on the Note

against Pearlman and the other borrowers, but the tort claims against Mercantile based on the

Offering Memorandum remain with each bank as discussed above.

In summary, American Bank may only recover its share of the participation agreement at this juncture. However, Rule 17 of the Federal Rules of Civil Procedure governs when a party may assert claims to which it is not the real party in interest. That rule allows a "reasonable time after objection" for substitution, ratification, or joinder. Fed. R. Civ. P. 17(a)(3). As such, American Bank urges that it be given an opportunity to seek ratification from the participating banks. Mercantile argues that ratification at this stage will cause it undue prejudice. However, no discernable showing of undue prejudice has been made. The mandate of Rule 17 is clear, a "reasonable time" for ratification must be given after objection. Id. Therefore, American Bank will have until June 9, 2011 to obtain ratification from participating banks.

## IV.  CONCLUSION

Based upon the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.  Mercantile's Motion for Summary Judgment [Docket No. 84] is **GRANTED IN PART AND DENIED IN PART**;

2.  Counts I, II, V, and VI are **DISMISSED WITH PREJUDICE**; and

3. American Bank has until June 9, 2011 to obtain Rule 17 ratification from participating banks.

BY THE COURT:


_____s/Ann D. Montgomery_____
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE


Dated:  May 9, 2011.